THE DETROIT FREE PRESS COMPANY v. THE BOARD OF STATE AUDITORS.

*State printing contracts—Advertising for bids—Bidders' bonds.*

Where the law requires the public printing to be let to the lowest bidder, an advertisement inviting proposals for doing fifty or more kinds of work at rates to be specified for each, but all the proposals of a bidder to be taken together as a single bid, and which gives no basis on which it is to be determined which bid in the aggregate is the lowest, does not accomplish the purpose of the law, and therefore is not in compliance with it.

Where the different kinds of work have no necessary connection with each other, *quære* whether the bids should not be entirely separate. But in this State the Board of State Auditors has undoubtedly considerable discretionary authority in determining how bids for State printing shall be invited, and as there are some conveniences in

having all the work done by the same person, it cannot be said as matter of law that they have no right to combine the proposals.

The State Board called for proposals for all kinds of printing as one bid, without any estimate of the different kinds of work, and without indicating any basis on which the Board might determine who was lowest bidder. The relator and others sent in bids, and the Board awarded the contract to another than the relator, professing to ascertain which bid was lowest by taking as a basis the printing for the two preceding years. The relator, on a showing that the public and the bidders had no means of making estimates on such a basis, and no reason to suppose it was to be adopted, and on a claim that its bid on any fair estimate was lowest, and that the letting was void, applied for a *mandamus* to compel the Board to invite new proposals. On the showing, it appearing that the Board had followed the practice of its predecessors—*Held:* (1) That as there was nothing to impeach the good faith of the Board, and as there was no reason to believe the difference in favor of relator's bid, if any, was insignificant, the court on that ground might decline to interfere. (2) That the relator, having participated in the lettings and made no objections until after the Board had announced its decision, was not then in position to dispute, in his own interest, the validity of the previous action. (3) That the court might properly refuse to interfere by *mandamus* since the effect might be indirectly to annul a contract; and *mandamus* is not a proper proceeding for that purpose.

In receiving proposals for public printing the Board is required by law to take from each bidder a bond with sureties conditioned that if the contract is awarded to him he will enter into it or pay damages. Such a bond should be approved before the biddings, and it is improper for the Board to leave it for consideration afterwards. But the Board having left the bonds without examination until after opening the bids, and the bond of the lowest bidder being defective, *held*, that it was not the right of other bidders to insist that the Board should not suffer the successful competitor to perfect his bond at that time.

MANDAMUS. Submitted Oct. 11. Denied Oct. 26.

*F. A. Baker* for the writ.

*Martin V. Montgomery* against.

COOLEY, J. This is an application for a *mandamus*. The petition sets forth that in June, 1881, the Secretary of State advertised for proposals to do the printing and binding for the State for the years 1881 and 1882. The advertisement

required the printing to be included in a single bid and to embrace the following :

1. The printing of the laws, daily and official journals and documents and reports and all other printing ordered by the Legislature, except compilations of the laws which might thereafter be ordered—or by an executive officer. These were to be printed in different type and style as was specified.

2. The printing of blanks for the different departments.

3. The printing of labels for file boxes, including lettering and numbering.

4. The printing of envelopes.

5. The printing of letter-headings and note-headings.

6. The printing of briefs for the Attorney-General.

7. The printing, ruling, binding, and covering of the dockets for the Supreme Court.

For the purposes of such a bid the Secretary of State furnished to applicants, and to the relator among others, a blank form.

That shortly before nine o'clock in the morning of July 27, 1881, which was the day and hour fixed for the reception of bids, the relator deposited in the office of the Secretary of State a bid for such printing, made out on a blank so furnished. The bid was for different items of the work in detail, there being nearly sixty in all, for each of which a price was named. A copy is given with the petition.

That accompanying the bid was a bond with two responsible sureties, as was required by the advertisement, conditioned to secure the State against loss if relator should withdraw its bid or fail to enter into a contract in case its bid should be accepted.

That the firm of W. S. George & Co., the present State printers, put in two bids for the same work, one in its own name and the other in the name of George H. House ; that the latter was much the lowest, and was accompanied by a bond with a single surety, who was irresponsible, " it being the intention that in case there were no bids by other parties lower than the said bid by W. S. George & Co. the Board

of State Auditors were to be prevailed upon to reject the said George H. House's bid because there was only one surety to his bidding bond, and he wholly irresponsible, and to award said contract to W. S. George & Co. as the lowest responsible bidder, and in case the board awarded the contract to said George H. House, he was to refuse to enter into the same or to furnish any securities for the performance thereof, and it was expected that in consequence thereof and of the inability of the State to realize on the bidding bond of said George H. House, the contract would be awarded to said W. S. George & Co. as being the lowest bidder who could furnish security for the performance of the contract. On the other hand, in case there were other bidders lower than the bid put in in the name of W. S. George & Co. then the said W. S. George & Co. were to furnish an additional security and have him sign the said bidding bond of the said George H. House, and thereby it was expected the said contract would be awarded to said George H. House ; and to secure to said W. S. George & Co. the benefit thereof, the said George H. House did, before said bids were filed, execute an assignment of his said bid and of any award that might be made to him thereon, to said W. S. George & Co." A copy of the House bid is attached to the petition ; it is made in the same form with that made by the relator, and some of the figures are lower and some are higher.

That many of the items specified in the bid have no connection with each other, and could more properly be let to separate biddings. A specification is made to show this in detail.

" That it has not been the practice of the Board of State Auditors in letting the State printing contract, to indicate in any way in the notice calling for proposals the basis on which it should be determined who is the lowest bidder ; neither have they indicated in any way the estimated quantities of the different kinds of work, and there has been no such uniform custom or practice pursued in this particular as to come to the knowledge of bidders, but the whole matter has been left open and uncertain and exclusively within the knowledge of the Board of State Auditors."

That after the bids were in, the Board of Auditors permitted said W. S. George & Co. to procure another surety to the House bond and thereafter on July 29, 1881, awarded to them the contract as assignees of said House, but failed to disclose any basis as having been adopted by them in awarding the contract, and bidders had no means of determining for themselves who was the lowest bidder.

That relator protested against the award claiming that its bid was the lowest, and that a hearing upon said protest was had before the board, when it was announced by the board for the first time that the work done under the contract for 1880 and 1881 was the basis adopted in determining that the House bid was the lowest; but that that contract only expires with the current year so that it cannot yet be determined how much of the different kinds of work will be done under it, and there are as yet no published reports showing the work already done, so that it would be impossible to apply this basis for the time that has run under that contract, except on examination and analysis of vouchers; and that on the basis of the work done for the years 1878 and 1879 relator's bid was the lowest.

That in awarding the contract for 1880 and 1881 the Board of Auditors, then composed of the same persons as now, adopted as a basis the five principal items as shown by the work done in 1876 and 1877, and that if the same basis was adopted in the present instance, the relator is the lowest bidder.

That the proceedings of the board in thus awarding the contract were illegal and void.

And relator prays that a *mandamus* issue commanding the Board to set aside such illegal award, and to advertise again for proposals, and in so doing to observe the following directions:

1. The notice calling for proposals to contain a basis or estimate by which it can be determined who is the lowest bidder.

2. The notice to call for a separate bid and contract for each item that has no reasonable or necessary connection with any other item.

3. The bidding bonds to be in a penalty not less than one-fourth the sum total of the amount of the estimated cost of the work to be performed under the contract.

4. The bidding bonds to be passed upon and approved before the bids are accepted and filed and before they are opened and examined..

Upon this petition the court is moved for an order upon the Board of Auditors to show cause why the prayer thereof shall not be granted. W. S. George & Co. are united as respondents by reason of their interest in the questions involved.

To an understanding of these questions it is necessary that reference be made to constitutional and statutory provisions bearing upon them.

The constitutional provision is that " The Legislature shall provide by law that the furnishing of fuel and stationery for the use of the State, the printing and binding the laws and journals, all blanks, paper, and printing for the executive departments, and all other printing ordered by the Legislature, shall be let by contract to the lowest bidder or bidders, who shall give adequate and satisfactory security for the performance thereof. The Legislature shall prescribe by law the manner in which the State printing shall be executed, and the accounts rendered therefor; and shall prohibit all charges for constructive labor. They shall not rescind nor alter such contract, nor release the person or persons taking the same, or his or their sureties, from the performance of any of the conditions of the contract." Article 4, § 22.

The statutory provisions now in force are the following :

The Secretary of State is required to publish in the month of June of every second year " a notice specifying the time and place for receiving separate sealed proposals for furnishing fuel and stationery for the use of the State, the printing and binding of the laws, journals, and documents, all blanks, papers, and printing for the executive and judicial departments, and all other printing ordered by the Legislature ;" the proposals to be received not later than 9 o'clock in the

forenoon of the fourth Wednesday of July, and the contracts to be awarded on or before the first Wednesday of August. General Laws 1873, p. 70.

The notice must specify the kind and quality of the articles, and the time when the same shall be delivered, and that ample security will be required for the faithful performance of each and every contract made in pursuance of such notice. Comp. L. § 293.

The printing and binding of the laws is to be after a style and manner to be specified in the notice. General Laws 1873, p. 71.

At the time and place specified in the notice the board is to convene, open and examine the proposals, and immediately enter into written contracts with the person or persons whose propositions are the lowest, and who shall give good and sufficient security to be approved by the board for the good and faithful performance of the contracts. Comp. L. § 295.

These are the provisions of law, and the first question for consideration is, whether they have been complied with by the Board of State Auditors. The general purpose is manifest. It is that the contracts for State printing and binding shall be so let as to secure the work being done on the best terms that can be obtained on public biddings open to free competition. The board comply with them when their action is such as to invite such competition; and they do not comply when they fail in this.

Objection is made to all the work being required to be covered by a single proposal. There is no doubt that in that way the best rates must generally if not always fail to be secured. One bidder offers the lowest price for one kind of work and another for another, but when all the offers of each are aggregated in one bid, the person whose bids average the lowest is supposed to succeed. In this case if the bids of the relator could have been accepted in part and those of Mr. House in part, the aggregate gain to the State must have been considerable. Nevertheless there must be some advantage in having all the work done by a single

contractor, and we cannot say it is absolutely illegal to require the bids to be made on an understanding that the offers of each bidder are to include all the work, and be compared with the others, and the whole work let as a single contract. From the very nature of the case the board must have a large discretion in respect to the details of the letting, and that discretion in the particular under consideration cannot, we think, be controlled except by legislation.

But in order that there may be full and free competition it is absolutely essential that bidders shall have the means of forming some estimate of what will be required of them and shall be apprised of the basis on which the calculations are to be made which are to decide between them. How, for example, can one intelligently put in bids to be averaged against the bids of others, for the printing of laws as one item, of blanks as another and of envelopes as another, when he has no knowledge what proportion of the different kinds of work may be required of him? One bidder may make a fair proposition for each and all the items on the supposition that the rest will do the same, but another by a low offer for such work as he thinks will be little called for, will seem to be lowest on the average, though his bid for the major part of the work is highest. But the objection to such bids is not merely that bidders must bid blindly, and therefore cannot afford to offer such terms as they would be safe in offering if they could bid with full knowledge; there is the further objection that the bids themselves are not conclusive, and the Board, when all are in, may favor one at the expense of others, without the possibility of redress, except, perhaps, in a very plain and gross case.

If a single bid must cover all the work, it is impossible that the full benefit of the constitutional and statutory provisions should be had unless some estimate is made in advance of the different kinds of work to be done, or unless each bidder is afforded the means of making an estimate on some basis which is indicated. As regards the printing of the laws, the reports and the legislative documents and journals, it is, of course, impossible to form any close estimate,

and bidders must take their chances; the information on the subject is open through the regular official publications as much to one as to another, and if this work were to be let by itself there would be no door open to injustice or favoritism. But when fifty items of different kinds of work are added to these, in respect to which no basis for an estimate of quantity is given, the case is altogether changed. Unless the bids are far apart, there are likely to be differences of opinion as to which is lowest, and perhaps a feeling on the part of bidders that they, as well as the State, have been wronged. Such a feeling in matters of public concern is a serious evil, unless the authorities are able to show to the general satisfaction that it is unfounded.

There can be no doubt whatever that both the Constitution and the statute contemplate a state of things in which, when the bids are in, the determination between them shall be a mere matter of inspection and calculation, in respect to which there can be no room for dispute. It was never contemplated that the basis for calculation should be left open for the action of the Board after the bids were in; for this would not only be unjust to the bidders, but would fail, for reasons already given, to secure the best results to the State. It would also subject the action of officials to the charge of partiality and injustice,—such as are made here,—even though their action may be conscientious and fair. One principal object of the requirement of public bidding was to render favoritism practically impossible. But in practice no one outside the membership of the Board can say that this is accomplished when the bids are invited and received before the basis on which they are to be considered is agreed upon and published.

But conceding that the proposals were not called for as is contemplated by the statute, it remains to be seen whether the relator can have the remedy sought. This involves a consideration of many things besides the mere interpretation of the Constitution and the laws. It is conceded that the present Board of Auditors has only followed the practice which has long existed; it has made no innova-

tion, but has continued an established practice. This is not, therefore, to be imputed to the board as an intentional wrong. The legal presumption is that the members of the Board supposed their official duty required of them the very course they have adopted.

It is also undoubted, as has been already indicated, that the board has large discretionary powers which the judiciary cannot control. It was so held in *Dewey v. Board of State Auditors* 32 Mich. 191. That case, in connection with *Ayres v. Board of State Auditors* 42 Mich. 422, will perhaps sufficiently indicate our views regarding the independent action of that tribunal. We cannot control their discretionary or judicial authority; and it is only when they decline to obey the law, whether intentionally or through misinterpretation, that a party who can show his interest is entitled to claim legal redress.

In this case, however, there are several difficulties. As already stated, the error of the Board does not, under the circumstances, impeach the good faith of the members. Moreover, the relator has made its bid under the invitation of the Board, and demanded a contract upon it. It is not, therefore, in condition to contest the validity of the proceedings previous to the actual letting. If the proposition for bids was unfair and illegal, a proper remedy might have been found in advance; but a party who participates and competes for the contract is too late afterwards to complain on his own account. The State might complain if its own interests had suffered; but the State is not complaining here, and on the papers presented to us it seems probable that the difference between the House bid and the bid of the relator is very small.

But a further answer to the present application is, that it is sought thereby to annul a contract already made; and this must be the result if successful. But contracts are not annulled by *mandamus*. The parties holding them are entitled to a trial of their rights in the customary modes, and are not at the mercy of this exceptional and summary process. If it were entirely clear that the action of the

Board in calling for bids was so defective and illegal as to be utterly void, we might, no doubt, in the interest of the State, hold it to be so in this proceeding; but in view of the long-existing practice we are not prepared to go to that length on the complaint of private citizens, made in their own interest.

One other matter mentioned in the petition may deserve notice. The Board, it seems, required of bidders a bond in the penalty of five thousand dollars only, to secure good faith in the bids. The work done under each contract amounts to ten or twelve times this sum, and it is justly said that a low bidder may sometimes find it to his interest to refuse to accept a contract when he incurs no greater penalty. It is also said that the object of the bond is in a measure lost unless it is approved in advance, for after the bids are opened a bidder whose bond is not accepted may at his option refuse to make it sufficient, and the Board, if he is willing to perfect it, may allow or refuse permission, according as the members may be disposed to favor him or to favor others. All this is perfectly correct; but for the reasons already assigned we must decline to interfere now. If it were proper to leave the bond for approval until the bids were opened, we have no doubt of the right to permit an imperfect or insufficient bond to be then made good. The State interest would require this, and the State interest is the chief consideration in all these transactions.

As we do not see that any good could be accomplished by making an order to show cause, the application will be denied.

MARSTON, C. J. and GRAVES, J. concurred.

CAMPBELL, J. I concur in the main in the views of my brother Cooley. I have some doubt how far any of the matters referred to, except as to the jurisdiction of the Board, could be examined by the judiciary, but as I concur in the result, it is not important to discuss them.