PEOPLE EX REL. CHARLES N. AYRES v. BOARD OF STATE
AUDITORS AND W. S. GEORGE & CO., STATE PRINTERS.

*Mandamus to State Auditors—Private relator in mandamus proceeding to enforce public laws—State Reporter—Printing and publishing State Reports.*

Mandamus lies to compel the Board of State Auditors to perform mandatory duties imposed on them by the Legislature outside of the exclusive powers vested in them by the Constitution. Art. viii., §§ 4, 5.

The Supreme Court will not interfere with the discretion of the Governor, nor subordinate him to its process; nor will it review the exercise of political and executory functions when they are not ministerial and would require the court to act outside of judicial authority. But State officers inferior to the Governor have many duties which the courts will compel them to perform.

The State of Michigan has never allowed itself to be sued in its own courts, and no officer of the State could lawfully subject it to suit.

A State contract that is not made as the Constitution requires, is not within the protection of the constitutional provision which forbids it to be varied.

It is within the discretion of the Legislature to decide whether it will publish the Supreme Court Reports at the expense of the State, but its decision will not bind its successors; if so published, it should be done by contract.

The published notice for bids for printing and publishing the Supreme Court Reports should inform bidders at what time the bids will be opened, so that the latter may be present and see that the contract is awarded to the lowest bidder as the law provides.

Remedy by mandamus is not precluded by the fact that the respondent may be liable as for a misdemeanor in wilfully neglecting his duty; a criminal prosecution will not secure its performance and specific compliance can be enforced only by mandamus.

A private person who would be a competent bidder under a State law for letting a contract may appear as relator by his own counsel in a proceeding by mandamus to compel State officers to carry out the law, if the public interest requires prompt action and the Attorney General declines to appear for him.

The rule rejecting the intervention of private complainants against public grievances is one of discretion and not of law.

Judicial discretion is always involved in mandamus cases, concerning the relief as well as other questions.

History of the office of State Reporter and of the mode of publishing the Supreme Court Reports.

The printing of the Supreme Court Reports is not, under the laws of Michigan, printing for the judicial department, and until 1871 it was not included in the " State printing " contract, nor classed as printing "ordered by the Legislature." Const., Art. iv., § 22.

In advertising for bids for printing and publishing the State reports under Act 168 of 1879, it is not lawful to impose the condition that the work shall be done at the capital.

MANDAMUS to require the Board of State Auditors to take action under Act 168 of 1879. This motion was first submitted October 28, 1879, and on November 30 the Supreme Court ordered that W. S. George & Co., State printers, should be included as respondents and required to show cause why the writ should not issue. The motion was again argued January 6, 1880. Mandamus granted January 13.

*Moore & Moore* and *F. A. Baker* for relator.

Attorney General *Otto Kirchner* for respondent Board of Auditors, and *N. F. Handy* and *Ashley Pond* for the State printers. A statute is not binding until it takes effect, *Rice v. Ruddiman,* 10 Mich., 125; *Price v. Hopkin,* 13 Mich., 318; a private citizen has no right to apply for mandamus to compel a public body to perform a duty, if he is not directly injured by their failure to do so, *People v. Regents,* 4 Mich., 98; mandamus does not lie against the Board of State Auditors, *Dewey v. Auditors,* 32 Mich., 191; *Ambler v. Auditor General,* 38 Mich., 746.

CAMPBELL, J. By Act No. 168 of the Laws of 1879, the Legislature repealed the former laws under which the Supreme Court reports were published by the State at its own expense and for its exclusive benefit, and provided for selling the use of the copyright for periods of eight years to the person who should agree to publish and sell them at the lowest rate per volume, such bidder being also required to deliver a certain number of copies to the State, and to furnish the State with sets of the

stereotype plates, and give security for his adherence to the conditions of the contract.

The statute required the Board of State Auditors in the first week of September, 1879, or as soon thereafter as the law should take effect, and every eight years thereafter, or as often as any contract should be forfeited, to advertise in six different newspapers, two of which should be published in Detroit, for six weeks, that proposals would be received and opened at the end of the advertisement, for the publication, stereotyping, printing, binding and sale of the reports, at a rate per volume to be mentioned in such proposals, not exceeding two dollars per volume. Each volume was to contain not less than 700 pages, and to be of the same style and quality as volume 38 of the Michigan reports in the State Library at Lansing. The stereotype plates were to belong to the State, subject to the use of the contractor. The first contract was not to take effect until January 1, 1880. As a separate part of the contract, the Auditors were to let the publication of reports from the stereotype plates of former volumes owned by the State. In 1877 provision had been made for stereotyping the reports in case the Auditors saw fit to do so. Laws 1877, p. 150. To what extent this has been done does not appear from this record, and is not important now to be considered. Other parts of the statute of 1879 are also of no special pertinency to the present case.

The statute of 1879 was not given immediate effect. The Legislature adjourned on the 31st of May, 1879, and the statute therefore did not become operative until the expiration of ninety days from that time.

The Board of Auditors failed to advertise or take any steps to carry out the statute, which in terms repealed the old law providing for publication by the State. The reason for this neglect is claimed to have been an objection to the validity of the statute, to be hereafter referred to, which we have no doubt was taken in good faith.

The relator obtained an order to show cause why

they should not be set in motion by mandamus, and cause was shown. He set forth among other things in his petition that he is engaged in publishing and selling law books, and was and is anxious and prepared to make bids and give security for the publication and other matters contemplated by the statute. He also refers to the statute as repealing all other acts providing for the publication of the reports, and claims that unless complied with, no reports can be published after January 1, 1880. He avers that they base their refusal on a contract made by them under the old law, and running two years.

The answer of the respondents objects to the jurisdiction to reach them by mandamus, and also to the right of the relator to appear for the People. The answer, which was presented on their behalf by the Attorney General, sets forth that on the 13th day of June, 1879, they published notices in the *Lansing Republican* and in two Detroit papers which are not named, specifying the time and place for receiving proposals for the various items of State printing, including the reports, and that these notices were published once a week for six weeks before the time specified for examining the proposals. A copy of the notice was appended to the answer. They further averred that they received no proposals after 9 o'clock in the forenoon of the fourth Wednesday of July, 1879; that they received before that time several proposals, including one from relator and one from W. S. George & Co.; that W. S. George & Co. were the lowest responsible bidders for the printing and binding, and that on the last Wednesday of August they made a contract with George & Co., a copy of which is appended to the answer, running two years from December 1, 1879 (which is a clerical error for the last day of December), at which time a former contract with the same parties runs out. The fourth Wednesday of July, 1879, was the 23d day of the month; and the last Wednesday of August was the 27th day of August.

42 MICH.—54.

The answer of the Board does not show when the bids were opened and contract awarded, and the notice fixed no time for their examination, and the contract appended to their answer does not cover some matters, including the binding, which would be necessary to complete the reports. It is averred, however, that on both printing and binding George & Co. were the lowest responsible bidders. The answer of George & Co., however, shows that the bids were opened on the 23d of July, 1879, and also sets out both contracts.

The answers claim that it was the duty of the Board to make the contract, and it is claimed that having been made, any action to the contrary, under the statute of 1879, would be a violation of constitutional obligations.

It is claimed on behalf of the relator that the statute of 1879 creates a duty which is imperative, and that the contract does not stand in the way.

Two important questions are presented in the outset: *First*, does mandamus lie against the respondents for failing to perform such a duty as that laid on them by the statute, in case the statute applies and is valid; and *second*, have we a proper relator before us?

It is claimed that the Board of State Auditors is a constitutional body, exercising original prerogative functions which the courts cannot interfere with, and in support of this view reference is made to the case of *Dewey v. The Board of State Auditors*, 32 Mich., 191. That was an application for an order to show cause why they should not consider a claim against the State for extra work done by the relator in compiling the statutes. This court refused it on the ground that in the action of the Board in such matters its jurisdiction was exclusive and original, and that it was not, when exercising such functions, to be regarded as an inferior tribunal, subject to our supervision. It has also been held that we cannot interfere with the discretion of the chief executive of the State or subordinate him to our process.

*People ex rel. Sutherland v. The Governor,* 29 Mich., 320.
We have also held that political and executive functions
cannot be subject to judicial review when·not minis-
terial, and when that review would require this court to
act outside of judicial authority.     *People ex rel. Ambler
v. Auditor General,* 38 Mich., 746; *Auditor General v.
Pullman Palace Car Co.,* 34 Mich., 59; *Supervisors of
Midland v. Auditor General,* 27 Mich., 165.     We also
held in *Royce v. Goodwin,* 22 Mich., 496, that the decis-
ion of this same body, acting as a board of State can-
vassers, was binding on the judiciary, and could only
be inquired into by the Legislature in the cases pro-
vided for by the Constitution.     But it has been held
repeatedly that State officers inferior to the Governor
have many duties which courts can compel them to per-
form; and our reports present very many such cases.

The question then arises whether this board stands
on a different footing in such cases as the present from
the State officers acting separately.

The Constitution vests this board with only two func-
tions: that of determining claims against the State, and
that of canvassing the votes for certain officers.     Article
8, §§ 4, 5.     In the latter case, as shown in *Royce v.
Goodwin,* the language of the Constitution as to the
finality of their action is entirely clear and free from
doubt or ambiguity.     In case of State accounts the
ground of their authority is equally clear.     Except in
regard to those ordinary claims against the State which
became fixed by the action of various auditing officers,
and involved no important inquiry, no claim against the
State could, under the old Constitution, be allowed except
by the Legislature.     The State has never, before or since,
allowed itself to be sued in its own courts, and no offi-
cer could lawfully subject it to suit.     *Michigan State
Bank v. Hastings,* 1 Doug. (Mich.), 225; *People ex rel.
Ambler v. Auditor General,* supra; *U. S. v. Clarke,* 8
Pet., 436; *Reeside v. Walker,* 11 How., 272; *Bonner v.
U. S.,* 9 Wal., 156; *Case v. Terrell,* 11 Wal., 199; *Avery
v. U. S.,* 12 Wal., 304.

We had no Petition of Right and no court of claims. The policy of the State, (as at that time of the United States also), left the sole power to allow claims against the State to the Legislature. In providing for a different method of determining claims against the State, it was not deemed proper to include it within the judicial power; and the inquiry not being subject to judicial action, any interference by this court with the auditing body in the exercise of its constitutional functions, would have been practically entertaining a suit against the State to compel the disposition of a claim which they had already rejected as not a claim entitled to consideration, and which we had no right to pass upon in one stage more than another.

When the Legislature sees fit to impose new duties on such a board, the agency thus created cannot be distinguished from any other State agency, and is subject to the same rules. The judicial power is the only means of enforcing obligations in ordinary cases, and where, as under the Act of 1879, the duties to be performed are laid down by mandate and not in any sense discretionary, the courts can inquire into the conduct of the State agents, and compel their action, unless the supposed obligation is in violation of some paramount right or duty which will excuse its non-performance.

We have no doubt the questions presented to us may be properly raised upon application for mandamus.

The question next arises whether the court will allow a private relator to complain of the alleged omission of duty. It is claimed by respondents that if they have done wrong they are guilty of a public and not a private wrong, and therefore that only the representative of the State can complain of their misconduct in this way.

The fact that for a willful omission of a statutory duty a public officer may be held for a misdemeanor (Comp. L., § 7677) does not preclude the specific remedy of mandamus. *Rex v. Severn & Wye Railway Co.*, 2 Barn. & Ald., 646. A criminal prosecution will not

secure the performance of the duty, which is the main purpose of the law, and which cannot properly be left to the option of any one. The only way to enforce specific compliance with the statute is by mandamus.

In the present case the officer whose duty it usually is to enforce the rights of the State, in this court, has, in the performance of his official functions as adviser of the State officers, placed himself in an adverse position, and appears for the respondents on this application. Inasmuch, then, as the Attorney General refuses to appear and seek the enforcement of the statutory provision, does his refusal preclude its enforcement? And if not, is the relator authorized to bring the matter before this court?

There may perhaps be others who have interests that would justify their appearance, but there is no one else whose duty it is to appear where the Attorney General declines to do so. It cannot be said that relator has any greater legal interest than other citizens, if the application must be made by an interested party. But if any party not actually interested may become relator or informer, then the fact that he is engaged in a business which would make him a competent bidder, and that he desires to become a bidder if the interest is set up for competition, removes him from the position of an officious interloper, and gives sufficient assurance that the controversy is genuine and in good faith.

The rule which rejects the intervention of private complainants against public grievances is one of discretion and not of law. There are serious objections against allowing mere interlopers to meddle with the affairs of the State, and it is not usually allowed unless under circumstances where the public injury by its refusal will be serious. In the cases of *People ex rel. Drake v. Regents of the University*, 4 Mich., 98, and *People ex rel. Russell v. Inspectors of the State Prison*, id., 187, the court took pains to guard against any decision that would prevent complaint by a private relator, where the public interests

require prompt action, and where the public prosecutors will not interfere. There is, as there shown, more liberality in some States than in others. But we find no reason to consider the matter as one lying outside of judicial discretion, which is always involved in mandamus cases concerning the relief as well as other questions.

Of the importance of the controversy there can be no doubt. It is claimed by the relator that if the statute of 1879 is valid as against the action set forth in the answer, the reports of the decisions of this court cannot be published until the statute is complied with. The law imposes duties on the State Reporter and on the Judges of this court, and changes their duties as existing under the former laws. It is evident, therefore, that sooner or later it will be necessary to pass upon these questions, and it is equally evident that it may better be done before new complications come into existence out of the uncertainty.

The controversy is principally based on the claim that the publication of the reports comes within the scope of certain constitutional provisions, which require contracts to be made, and which do not allow them to be varied with or without consent. There is also another important question whether if the board had power to bind the State at the time the contract referred to in the answer was made, it was made in conformity with existing law.

The constitutional provision chiefly relied on is section 22 of Article 4, which is as follows:

"The Legislature shall provide by law that the furnishing of fuel and stationery for the use of the State, the printing and binding the laws and journals, all blanks, paper and printing for the executive departments, and all other printing ordered by the Legislature, shall be let by contract to the lowest bidder or bidders, who shall give adequate and satisfactory security for the performance thereof. The Legislature shall prescribe by law the manner in which the State printing shall be executed and the accounts rendered therefor; and shall prohibit

all charges for constructive labor. They shall not rescind nor alter such contract, nor release the person or persons taking the same, or his or their sureties, from the performance of any of the conditions of the contract. No member of the Legislature, nor officer of the State, shall be interested directly or indirectly in any such contract."

Section 36 of the same article provides:

"The Legislature shall provide for the speedy publication of all statute laws of a public nature, and of such judicial decisions as it may deem expedient. All laws and judicial decisions shall be free for publication by any person."

The Schedule, by section 12, abolished the office of State Printer after the expiration of the existing term. And by section 13 it was made the duty of the Legislature, at its first session, to adapt existing laws to the provisions of the new Constitution as far as may be.

The office of State Reporter as originally created was one which left the Reporter entirely independent of State assistance beyond his salary, and he published at his own expense and account. Rev. Stat. 1838, p. 414. At that time his duties included reporting for the Court of Chancery, and the Supreme Court. In 1842, when only part of Harrington's Chancery Reports had been published, this salary, with many other expenses, was suspended. Laws 1842, p. 168. In 1844 a new act was passed, under which the State was to advance the cost of publication, and be reimbursed out of the sales. Laws 1844, p. 19. This law with slight modifications was embodied in the Revised Statutes of 1846, and continued in force, with no important changes until 1871. Comp. L. 1871, p. 1649. Up to that time the Reporter published where he pleased, and not under the State printing contract. He could employ the State printer or any other printer at his option. Previous to 1871 the work was, except as to three volumes, in fact done elsewhere, and those volumes were not published under the State contract.

In adapting the statutes to the new Constitution, full provision was made for letting the State printing con-

tracts as required by the clause of the Constitution already referred to. But no notice was taken of the reports, which were not included or provided for in any law governing those contracts. They had not been reckoned a part of the State printing before the Constitution of 1850, and they were not so regarded for twenty years thereafter. The constitutional requirement as to what kind of printing should be let by contract, so far as it went into details, did not embrace anything but the laws and journals, and such documents as were printed for the executive departments. It is only by adding "all other printing ordered by the Legislature," that a considerable class of reports and legislative documents and manuals are covered at all. And there are certain kinds of printing in the shape of notices and similar publications which could not be thus provided for. Whatever may be the meaning of the clause "ordered by the Legislature," it did not cover the reports at that time. And although they have since 1871 been published on the sole account of the State, the statutes have kept up a distinction indicating that this work is considered as differing in some respects in management from the other State work.

Although the law of 1871 made provision for having the reports printed by the person having the general printing contract, there was no provision then made, and no provision has been made since which refers to them, complying with the constitutional provision touching the manner of publication of State work. That expressly requires the Legislature itself to designate the manner in which the printing is to be executed. This has been done uniformly in regard to the other printing. The law of 1851, which was not changed by amendment until 1873, required the work of State printing to conform to the similar work done in 1847. Comp. L., § 294. In 1873 this section was changed so as to leave the direction as to manner and style of publishing the laws, journals and documents to the Board of State

Auditors, or such other officers as had the matters in charge. Laws 1873, p. 71. But this was corrected by a subsequent act of the same session, which made a new and full provision for the future style and manner of publishing the laws and documents. As to these it left nothing to be decided by the discretion of any one else, which could be regulated in advance. Laws 1873, p. 209. No statute is found, prior to the Act of 1879, on which the application before us is based, which makes any provision concerning the style and manner of publishing any law reports, except reprints of old volumes. Laws 1875, p. 260.

Unless the act of 1873, p. 70, amending section 292 of the Compiled Laws, was intended to cover the reports, there has been no statute which expressly requires them to be contracted for with the other State printing, or which authorizes it except by a somewhat liberal implication. The law of 1873 requires advertising for printing for the judicial as well as other departments. But the printing of the reports is in no sense printing for the judicial department. It is not done for the Courts and is not under their direction except in a very indirect way. And as already suggested, no provision is made in this statute for determining the style and manner of publication. There is nothing to exonerate the Reporter from the duty of determining this himself. They are as much left out of any legislation purporting to be in obedience to section 22, article 4 of the Constitution, as when the Reporter had the copyright and emoluments for himself. The reports differ from all other State documents in being copyrighted and sold in the market. The statutory distinction has always been kept up, and no legislation concerning them has complied with the constitutional requirements in regard to the manner of contracting for the general State printing. A contract which is not made as the Constitution requires it to be made, cannot come within the protection of the Constitution in regard to the right of the Legislature to make

a new one.   And while we are not disposed to question the propriety of the action of the Auditors in putting them on the same footing so far as practicable in their contracts, yet the present contracts set up in the answers show on their face the difficulty they found in so doing. In advertising for the printing of the reports, the standard adopted was volume 38.   This was the act of the Auditors themselves, and they undoubtedly did it because the Legislature had given no directions on the subject.   It may here be remarked that one objection to the validity of the statute strongly insisted on by the answers, is that the statutory standard was this same volume 38, which was not in complete existence.   It is needless to remark that if there is anything in this objection, it would be quite as fatal to the contract which adopts it. But we do not think the unfinished condition of this volume prevents it from being a sufficient guide for either. Nevertheless, the failure of the legislation under which the contracts were made, to direct how the printing should be executed, deprives that legislation of any constitutional sufficiency to protect the contract for the reports from interference, if otherwise it might have been within the protection.   It indicates a legislative intent to keep the work separate.

But we think the respondents are in error concerning the meaning of the Constitution.   That instrument does not require the Legislature to publish these reports at all at its own expense, or on its own account, and it must be within the legislative discretion what it will so publish and what it will not.   Assuming them to come within the category of printing which if done at all for the State must be done under a printing contract, it would be a strange and unreasonable rule to hold that whenever the Legislature has once assumed the publication of a particular document or class of documents, it must thenceforth continue to publish them whether considered desirable or not, and in spite of private publications of the same matter.   The utmost that can be

claimed is that if published they should be published by contract. No Legislature can bind its successors to publish at State expense documents which it does not regard as desirable to be so published. And no contract has ever been authorized or made, so far as we have discovered, which bound the State to publish anything it did not choose to publish. Most State documents will not be published at all unless by the State, and some are never published. But the statute of 1879 shows, what is well known to every one, that there is no occasion for the undertaking by the State to be at the trouble and risk of publishing the law reports at its own expense. The State, therefore, has seen fit to dispose of its copyright to others, who are to publish them at their own expense and for their own benefit, the only conditions being such as will give the State what is deemed a fair compensation for the privilege, and secure the purchasers of the published volumes from extortion. We think there is no doubt whatever of the right of the State to abstain from any further publication on its own account, and that it is only such publication by the State at its own expense as comes in any case within the constitutional provision.

It is proper further to call the attention of the respondents to the fact that the statute contemplates that the notice for bids should inform the bidders at what time the bids will be opened and examined, in order that they may be present, if they wish, and see that the law allotting the contract to the lowest bidder is complied with.

And their attention is further called to the provisions of the Constitution, with which the statute complies, as it must comply, which will not permit the Board to impose as a condition of bidding that the work shall be done at the capital. It must be thrown open to all bidders.

The mandamus must issue requiring them to proceed to advertise under the law of 1879.

The other Justices concurred.