## VALIDITY OF AND MEANING OF THE HOME RULE AMENDMENT TO THE OHIO CONSTITUTION.

Common Pleas Court of Franklin County.

CHARLES S. HOCKETT, ACTING FOR HIMSELF AND FOR ALL OTHER SIMILARLY SITUATED TAX-PAYERS IN FORTY-FIVE PROHIBITION COUNTIES IN THE STATE OF OHIO, TOO NUMEROUS TO MENTION, v. THE STATE LIQUOR LICENSE BOARD OF THE STATE OF OHIO, AND CHARLES L. ALLEN, BYRON CLENDENING AND J. H. SECREST, MEMBERS OF THE STATE LIQUOR LICENSING BOARD OF THE STATE OF OHIO.

Decided, December, 1914.

*Constitutional Law—Validity of the Home Rule Amendment—Existing Election Machinery Was Sufficient for Its Adoption—Function of the Judiciary with Reference to Changes in the Organic Law—Operation of the Initiative and Referendum—Injury to Thrift Not Within the Provision Against Impairment of the Obligation of Contracts—Bar of the Amendment Against a Certain Class of Legislation Does Not Destroy the Republican Form of Government or Violate the Welfare Clause of the Federal Constitution—Retroactive Legislation.*

1. Disastrous results to business or trade, following ill-advised or illegally enacted law, can not be made the basis of a court proceeding for relief to either an individual citizen or the public in general.

2. But an allegation that the recent Home Rule Amendment was not adopted in the manner authorized by the Constitution or by the laws of the state presents a question so serious that the court in its discretion may permit a tax-payer to maintain an action to enjoin the State Licensing Board from taking action thereunder in contemplation of expenditures of public funds.

3. A constitutional amendment must be adopted in strict conformity to the method provided by the existing Constitution, and it is within the province of the judiciary for a court to inquire whether in the adoption of an amendment the provisions have been followed.

4. The Ohio Constitution has reserved to the people the power both to propose laws to the General Assembly and to propose amendments to the Constitution, and to adopt or reject either on a referendum vote.

5. The amendment of 1912 to Article II of the state Constitution be-
came operative and in full force from its adoption with respect to
all of its provisions, including the provision as to how future amend-
ments to the Constitution shall be submitted and adopted, and as to
those provisions the amendment was self-executing and required
no further legislative enactment; and the fact that a method is pro-
vided for the submission of an amendment at a general election
and for a vote thereon, together with the fact that the people did
vote on the amendment restricting to a certain extent further
legislation having reference to manufacture or sale of intoxicating
liquors, is a sufficient warrant for a court to declare that it has
become part of the organic law of the state, notwithstanding elec-
tion machinery has not been provided for canvassing, counting and
reporting the vote thereon.

6. The language of the Constitution definitely and distinctly was in-
tended to appropriate the general state election machinery for
the adoption or rejection of amendments to the Constitution pro-
posed under its provisions.

   Section 4785, General Code, must be presumed to have been in
contemplation of both the framers of the constitutional amend-
ments and the Legislature. Its provisions as well as those of
the Constitution are sufficient to require the elections on amend-
ments to be conducted according to law. Furthermore Section
5019, General Code, was specially amended to provide for elec-
tion on referendum of laws and constitutional amendments, and is
adequate for that purpose.

7. Elections belong to the political branch of government. Therefore
a petition averring irregularities and illegalities in an election
presents no case authorizing a court of equity to interfere by
injunction against the acts resulting from such election; such
petition presents no question of equitable jurisdiction whatever.
*Link* v. *Karb*, 89 O. S., 21, followed and applied.

   Adequate provision is made for the election machinery. The
initiative and referendum amendments to the Constitution are
self-executing and have been sufficiently supplemented by legisla-
tive enactment to carry them into effect.

8. The interpretation given by advocates or opponents of proposed
amendments in a political campaign will not be followed by the
courts merely because the amendment is thereafter adopted by
the voters.

9. The Home Rule Amendment construed (see opinion).

10. The retroactive effect and operation of the amendment does not
militate against its validity.

11. The tempermental change in the matter of thrift, which it is claimed
will overtake the people upon the introduction of saloons in locali-

ties where they did not before exist, whereby ability to purchase will be impaired and property will depreciate in value, is not a matter which tends to impair the obligation of contracts within the meaning of the federal Constitution.

12. The bar which is raised by this amendment against the further enactment of laws restricting traffic in intoxicating liquors, is not in contravention of the republican form of government nor does it violate the walfare clause of the federal Constitution.

*A. Jay Miller, H. B. Emerson, J. A. White, Howenstein & Houston, John E. West, Miller, Miller, Brady & Seeley,* for plaintiffs.

*Timothy S. Hogan,* Attorney-General, and *J. I. Boulger,* contra.

KINKEAD, J.

Plaintiff for himself and all others similarly situated, brings this action as a citizen, a resident, an elector and a tax-payer in the city of Bellefontaine, Logan county, and state of Ohio. As such he avers he is concerned with the proper and legal administration of the offices and duties of all the state officers in the state. As an additional basis for his claim of right he alleges in substance that, relying upon the adoption, of the previous fundamental and other liquor laws he greatly increased his business of selling pianos on credit, and thereby depended upon the thrift of the citizens to carry out their contractual relations with him free from the influence of saloons in the county. It is further alleged as ground for his right to maintain the action that the saloon contributes to the excessive use of intoxicating liquors, endangers the public health, public morals and public safety, and directly lessens the thrift of its citizens and impairs their capability to meet their contractual obligations.

Individually the plaintiff claims, as owner of certain personal and real property, that the earnings therefrom will be jeopardized and decreased as well as the value; that any illegal and improper act on the part of the defendants, permitting the establishment of saloons would jeopardize the earnings and savings arising from the thrift of the people, and the taxes plaintiff must pay to the state and its political subdivisions would be increased

and the earning power of the investments of plaintiff would be materially lessened.

The opinion and judgment of the court is that the claims alleged in support of the right to maintain the action as a citizen and tax-payer seem to relate to purely governmental rights and duties concerning which courts may not afford relief or redress. If disastrous results to business or trade follow from ill-advised, improper or even illegally enacted law, they can not be made the basis of action for relief to the individual citizen or the citizenship in general.

The grounds of the claim of right to prosecute this action would seem in a measure to disclose that it is sought to have the judiciary interfere with the power of the entire electorate of the state because an amendment to the Constitution has been passed which operates to the moral or material detriment of the citizenship. It must be conceded that the courts have no such power.

It appears, however, from the body of the complaint, that the real contention is, that the so-called home rule amendment to the Constitution was not adopted in a manner authorized either by the Constitution, or by the laws of the state. That presents a serious and momentous question, and if there is foundation for it, there ought to be some remedy afforded individuals, if recourse may not be had through the legal officers of the state. Mandamus and quo warranto are the remedies for redress of official misconduct, or the wrongful exercise of powers. These remedies are pursued by the legal officers of the government, although mandamus may be resorted to by individuals. It is said that there are serious objections against allowing mere interlopers to meddle with the affairs of the state, and this is not usually allowed, unless under peculiar circumstances when the public injury by its refusal will be serious. The Attorney-General is the adviser and representative of the state officials, and there may be no way of testing important legal questions involving expenditure of public money that might vitally affect citizens, electors and tax-payers.

In reference to the extraordinary remedies it is said in some jurisdictions that "the rule which rejects the intervention of

private complainants is one of discretion and not of law." See *Ayres* v. *Board,* 42 Mich., 422; *State, ex rel,* v. *Nash,* 66 O. S., 612.

The right of a tax-payer to maintain injunction against unlawful official misconduct on the part of state, county or municipal officers has been the recognized practice in cases where such misconduct may result in the expenditure of public money. And may the courts not appropriately exercise some discretion in extending the right to a tax-payer to bring such action even though he may be remotely affected? The rule has been adopted in *Green* v. *State Civil Service Commission,* 90 O. S., —, that:

"A tax-payer may maintain an action to enjoin public officers or a public commission from the commission of acts in excess of legal authority which contemplate the expenditure of public money."

This action is sustainable on this ground. If the contention of plaintiff be sound, the defendants would commit acts in excess of legal authority which would necessitate the expenditure of public money. It matters not how the public money be exacted, for it becomes public money without regard to the mode of collection, or by whom paid. The first claim of plaintiff is that:

"Sections 1a, 1b and 1g of Article II of the Constitution provide no method nor means for submitting the proposed amendment to the electors of the state or of counting or canvassing the vote thereon, or of ascertaining its approval or rejection;"

"That the act relating to certain proposed amendments found in 103 O. L., 724, 725, is limited to the election in November, 1913, and in no way applies to the election of November, 1914:

"That the power in Section 1g given to pass laws to facilitate the operation of Sections 1a and 1b of Article II has not been exercised for the submission of the home rule amendment, and the Secretary of State of Ohio was without authority to conduct said election of November 3d, 1914, on said amendment, and the deputy state supervisors of elections in the various counties of Ohio were without authority of law to certify returns of the votes cast for and against said proposed amendment."

The question naturally arises whether the judiciary has the right or power to declare an amendment to the Constitution rati-

fied or approved by a majority vote of the electors to be null and void, because adequate machinery has not been provided either by the Constitution or by the law for the proper conduct and ascertainment of the election.

Was the proposed amendment to the Constitution properly submitted according to the method or manner prescribed by the Constitution itself, or by the Constitution and laws passed by the Legislative branch to facilitate its submission?

It is to be conceded that the power which is inherent in the people must be exercised in a lawful manner; that the Constitution is paramount and supreme over all branches of government. If it prescribes the exact method in which the amendment shall be submitted, and defines positively the manner of its submission, such constitutional directions are mandatory on all departments of government; without strict compliance therewith, an amendment to the Constitution can not be validly adopted. Whether such amendment has been legally submitted or validly adopted depends then upon the fact of compliance or non-compliance with the constitutional directions as to how the same shall be adopted, and whether such compliance has in fact been had, must, in the nature of the case, be a judicial question. While it is not competent for courts to inquire into the validity of the Constitution and form of government under which they themselves exist, yet where the existing Constitution prescribes a method for its own amendment, to be valid the same must be adopted in strict conformity to that method; and it is the duty of the courts in a proper case to inquire whether, in the adoption of the amendment, the provisions of the existing Constitution have been observed, and if not, to declare the amendment invalid and of no effect. *Koehler* v. *Hill*, 60 Iowa, 543; *State, ex rel,* v. *Powell*, 77 Miss., 543 (48 L. R. A., 652); *Collier* v. *Frierson*, 24 Ala., 100, and other cases.

The provisions of the Constitution for its own amendment being mandatory, and to be strictly observed, it follows that failure to pursue its mandates has been regarded by some of the decisions as fatal to a proposed amendment, notwithstanding it may have been submitted to, ratified and approved by the people. The

constitutional provisions are binding upon the people themselves; it is held that they can not give legal effect to an amendment submitted in disregard of limitations imposed by the law—the Constitution—prescribed as a limitation on their own government. *Kadderly* v. *Portland,* 44 Ore., 118, and cases cited therein.

These rules have relation to the old methods and not to the "initiative and referendum."

The inquiry here is whether adequate provision has been made either by the Constitution itself, or by its provisions supplemented by legislative enactment.

The Constitution by Article II, Section 1, has reserved to the people "the power to propose to the General Assembly laws and amendments to the Constitution."

It has thus reserved two separate powers, one to propose laws to the General Assembly, second to propose amendments and to adopt or reject either laws or amendments to the Constitution on a referendum vote. It reserves power in the people to propose amendments to the Constitution independent of the General Assembly, and to adopt or reject the same at the polls.

The term "first aforesaid power," used in Section 1*a*, means the power to propose both laws and amendments to the Constitution, which is reserved by the people and is designated as the "Initiative."

The Constitution prescribes the manner in which either laws or amendments to the Constitution are to be initiated, viz., by petition, signed by a certain percentage of electors. To initiate an amendment to the Constitution, ten per centum of the electors is required. When a proper petition is signed, it is to be filed with the Secretary of State, duly verified, the full text of which is to be set forth in the petition.

Then it is required that "the Secretary of State shall submit for approval or rejection of the electors, the proposed amendment, in the manner hereinafter provided, at the next succeeding or *general* election in any year occurring subsequent to ninety days after filing such petition. *General* election is designated in election laws as the state election, while the term *succeeding reg-*

*ular election* must have reference to the election of municipal, township and certain county officials, which election is held in every precinct of the state.  Provision is made that the proposed amendment shall have printed across the top thereof: "Amendment to the Constitution Proposed by the Initiative Petition to be Submitted Directly to the Electors."

It is then provided that,

"Any proposed  *  *  *  amendment to the Constitution submitted to the electors as provided in Section 1a and Section 1b, if approved by a majority of the electors, voting thereon, shall take effect thirty days after the election at which it was approved and shall be published by the Secretary of State."

Provision is made for conflicting amendments submitted at the same time as to which shall be declared adopted according to the vote on each.  It is required that:

"The Secretary of State shall cause to be printed the  *  *  * proposed amendment to the Constitution, together with the arguments and explanations," etc.,

in the manner provided, and to distribute the same.

"Unless otherwise provided by law, the Secretary of State shall cause to be placed upon the ballots, the title to any such  *  *  *  proposed amendment to the Constitution, to be submitted.  He shall also cause the ballots so to be printed as to permit an affirmative or negative vote upon each  *  *  *  proposed amendment to the Constitution.  The style of  *  *  * all constitutional amendments shall be:  Be it Resolved by the People of the State of Ohio."

The basis for the required number of petitioners is fixed by the Constitution.  Finally, it is provided:

"The foregoing provisions of this section shall be self-executing, except as herein otherwise provided.  Laws may be passed to facilitate their operation, but in no way limiting or restricting either such provisions or the powers herein reserved."

"Self-executing" means that the amendments to Article II made in 1912, became operative and in full force from its adop-

tion in respect to all its provisions, providing how future adoption of amendments to the Constitution shall be submitted and adopted without further legislative enactment. Full and explicit provision was made by the self-executive amendment for the initiation, the submission, the vote, and all essentials excepting the minor details of the election machinery. The Secretary of State is designated as the officer to receive and cause proposed amendments to be placed upon the ballots. The time when an amendment shall take effect is fixed, and it is made the duty of the Secretary of State to publish the same when adopted.

Though no special provision is made in the Constitution concerning the qualification of electors, or the election machinery, the fact that a method for submission of an amendment at a general election and for a vote was made therein, together with the fact that the people did vote for the amendment involved in this case, and that it was carried, must be sufficient to warrant the judiciary, without anything else, in declaring that it has become part of the organic law, even if election machinery has not been fully provided for either by Constitution or statute. There is excellent precedent for such a view, in addition to the common sense of the proposition.

The Kansas case cited by the Attorney-General involved a prohibition amendment, and as in our state,

"There was a crowning effort of a brave and earnest people to free itself from the curse of intoxication, while on the other side the forces were claiming that such radical change in policy trespassed upon personal liberty and rights of property."

It was observed by Mr. Justice Brewer that,

"Questions of policy are not questions for courts; they are wrought out and fought out in the Legislature and before the people. With courts, the single question is one of power. We make no laws; we change no constitutions; we inaugurate no policy. When a constitutional amendment has been submitted, the single inquiry for us is, whether it has received the sanction of popular approval in the manner prescribed by law."

The question in constitutional prohibitory amendment, 24 Kan., 700, was as here:

"Does the fact that any officers assumed to conduct the election and canvass, bind any one to determine the result, unless such officers were by law authorized to so conduct and canvass? In short, is not the failure to name the officers and provide the machinery for the election such an omission as renders invalid any election *in fact held*, or any canvass and declaration of *result in fact made?*"

Here it is urged that no machinery at all was provided in the Constitution itself, or by law for the conduct of election, for transmission and canvass of votes, and for the pronouncement of the result.

It is claimed that:

"Until a general law is passed in accordance with the words of Section 1*a* 'hereinafter provided,' if the character and nature of the proposed amendments do not meet with the approval of the Legislature then in being, none can be submitted." "Consequently," it is argued, "that neither the home rule amendment nor the prohibition amendment have been legally submitted to the electors in November, 1914, and that no matter how the people voted it was all 'without the pale of the law' and the majority of the electors voting for either one of the proposed amendments could not make it valid and an integral part of our Constitution."

The fact is there is nothing in the Constitution about the "election machinery." It does provide, however, that the Secretary of state shall submit the proposed amendment at the *next succeeding regular or general election in any year occurring subsequent to* ninety days after the filing of the petition.

It is argued that an act "relating to certain proposed amendments to the Constitution of Ohio and the publication thereof" passed April 28, 1913, 103 O. L., 724, relates only to the election to be held on the first Tuesday after the first Monday of November, 1913. That is the fact, but that act was a mere temporary one for that year alone, so we are not the least concerned with it on the questions involved.

It is also contended that 103 O. L., 554, amending General Code, Section 5019, provides no manner for canvassing the votes or returns to the Secretary of State.

It is next contended that Section 4785 providing that:

"Except when otherwise provided by law all public elections in the state shall be conducted according to the provisions of this title,"

can be of no avail because Section 1a, of Article II when adopted in September, 1912, distinctly provided that the "manner" shall be as "hereinafter provided," which, it is claimed, referred to future provisions of the Legislature or a further provision in the Constitution, neither of which has ever been made. It is claimed also that the provisions of the General Code on Elections do not furnish any "machinery" for the *counting* or the *reporting* of votes cast on "proposed amendments" nor for any *canvass* of such votes at all, although all other kinds of elections are specifically provided for.

The foregoing claims, made by counsel for plaintiff, are true in fact, except as to the deduction they make from Sections 4785 and 5019.

All the claims of counsel for plaintiff as to the alleged want of election machinery have now been fully stated. Properly comprehended and stated the question is whether the alleged failure to enact legislation *specifically* referring to elections on proposed constitutional amendments and providing for counting ballots, reporting and canvassing the same, subsequent to the adoption of the 1912 amendment to the Constitution, is fatal to the election, notwithstanding the fact that the present amendment was voted upon at a *general* election, and notwithstanding full and adequate provision is made for all the details of such *general* election, for casting and counting the votes, for transmission of all votes by the deputy state supervisors to the state supervisor, and for returns and abstracts of all votes and transmission to the Secretary of State and for the canvassing thereof.

Whatever foundation such claims may have (we think absolutely none) they are strikingly answered by the homespun and common sense reasoning of Mr. Justice Brewer in the Prohibitory Amendatory Amendment in 24 Kans., 700, which involved the precise claim made here. The rule must operate uniformly on "Wet" or "Dry" Amendment.

The court therefore quotes the opinion of Mr. Justice Brewer:

"And first, the election itself was authorized by law. It was not a mere volunteer proceeding. The proposition was put by legislative sanction before the people, who were invited to consider and act upon it. 'The following proposition shall be submitted to the electors of the state for adoption or rejection.' Both Constitution and statute name the time and the persons at which and to whom this proposition is submitted. And the statute further provides that the proposition shall be submitted 'at the *general election.*' This implies something more than the mere matter of time. The Constitution says 'at which time.' But the statute goes further: it does not read, at the time, or on the day of the general election, but at that election itself. For the purpose of voting upon and determining the question submitted, it thus refers to and appropriates the statutory machinery of the general election. Concede that this may technically be limited to the mere proceedings of election day and that the Constitution and statute together, prescribing the form of ballots, the parties entitled to vote, the time of election, and the election machinery, have exhausted their force at the close of the polls, and what then?

"Must not the court take judicial notice of the result? We are bound to know what the Constitution is, what the statutes are. We take judicial notice of them. No proof is required— none is proper * * * of course, we take judicial notice, without proof of all the laws of our own state * * * and in doing this, we take judicial notice of what our books of published law contain, of what the enrolled bills contain, of what the journals of the Legislature contain, and, indeed, of everything that is allowed to affect the validity of any law, or that is allowed to affect or modify its meaning in any respect whatever.

"Now, the Constitution provides that 'if a majority of the electors voting on said amendments at said election shall adopt the amendments, the same shall become part of the Constitution.' Suppose a majority did adopt, but no machinery is provided for ascertaining that fact, no one is authorized to canvass and proclaim the result, and no one in fact does so canvass and proclaim; must not the court nevertheless take judicial notice of the result? When the Constitution says that upon certain conditions an amendment is adopted, must we not take judicial notice of the happening of those conditions? It is not the election, and not the canvass, that works the change; and if we are bound to take notice 'of everything that is allowed to affect the validity

of any law,' must we not of everything affecting the fundamental as well as the statute law? And judicial notice does not depend on the actual knowledge of the judge or the extent of the personal labor and inquiry required. The justice of the peace in the most remote county in the northwest portion of the state, may never have seen a copy of the journal of either house, takes judicial notice of all things appearing in either journal, so far as they affect the validity of any law. When challenge is made, we must investigate and know. So, although it may seem extravagant, yet if the Legislature has failed to make provision for the canvass of any vote on a proposed constitutional amendment, and if in fact none be made, must not the courts take judicial notice of the actual vote and its result? It may be said if we take judicial notice of votes on one question, why not on all and what need of election contests? Let the court determine on its judicial knowledge. But we do not take judicial notice of them so far, and only so far, as they affect the validity of some published law.   *   *   *

"The courts are to know what is and what is not the public law of the state; what is and what is not a part of the Constitution; and to that end, must take judicial notice of everything, near or remote, that determines such fact. This argument condensed is that: the courts take judicial notice of what is published law, statutory or constitutional. When a majority of the electors voting on an amendment at an election properly ordered, adopts it, then it becomes a part of the Constitution. So the Constitution itself says. The courts must judicially know whether such amendment has been adopted, and is in fact a part of the Constitution, and to that end, if need be, must take judicial notice of every ballot cast at that election.

"But second: Does not a fair reading, a reasonable construction of the resolution, make it broad enough to appropriate the entire election machinery, including all relating to canvass as well as to casting votes? It says that the proposition 'shall be submitted to the electors of the state for adoption or rejection, at the general election to be held on the Tuesday succeeding'; and the second section prescribes the form of the ballot. This, as we have just considered, plainly authorizes the vote.

"Does it not also appropriate the whole election machinery?

"We have a general election law. It is a single statute, yet it covers all details of ordinary elections, names election boards, prescribes rules of election, provides for returns and canvass of all votes.   *   *   *   It is one election law of the state. It is a general election law. Now, when a proposition is submitted to

the people at a general election, without further words of desig-
nation, does it not mean that the proposition is to be decided
in the manner prescribed by that general election law? It is an
old and familiar doctrine that that which is within the spirit of
the statute, though not within the letter, is a part of it; as
well as that which is not within the spirit but within the letter,
is not a part of it. If * * * it should be stated that a ques-
tion had been submitted to the electors at a specific and named
election, the universal understanding would be, not only that
the votes were to be received, but also that they were to be
counted, canvassed, and the result proclaimed; and all this would
be implied from the simple statement in reference to the sub-
mission. Should not equal extent be given to the language used
by the Legislature if, without such extent, its intended action
fails? Of course, what the Legislature omits, the courts can
not supply. But the largest latitude may, and should be given
to the language used, in order to uphold, rather than defeat its
action. Especially is this true, when otherwise, large interests
fully considered, will fail. And more especially is this true,
when upon the faith of such legislative action the people of the
whole state have been stirred up and moved to express their
judgment upon a matter understood to be before them for de-
cision. * * * Nearly two years elapsed between the time
the proposition passed the Legislature and the day of the popu-
lar vote. During this time this question was not forgotten. It
was discussed in every household and at every meeting. The
state was thoroughly canvassed; its merits and demerits were
presented and supported by all possible argument. Pulpit, press
and platform were full of it. It was assumed on all sides that
the question was before the people for decision. There was not
even a suggestion of any such defect in the form of submission
as would defeat a popular decision. * * * There was not a
suggestion from friend or foe. The contest was warm and ac-
tive. After the contest was ended and the election over, the
claim is for the first time made that after all there was nothing,
in fact, before the people; that this whole canvass, excitement
and struggle was simply a stupenduous farce, meaning nothing,
accomplishing nothing. This is a government of the people, by
the people, and for the people. This court has again and again
recognized the doctrine lying at the foundation of popular gov-
ernments, that in elections the will of the majority controls, and
that mere irregularities or informalities in the conduct of an
election are important to thwart the expressed will of such ma-
jority.''

The court is of opinion that the claims of counsel are groundless, technical and fallacious. No court should found a judgment upon such contentions, in view of the specific provisions contained in the Constitution, and of the adequate provision for general election machinery.

The provisions of the Constitution are definite and certain in specifying how, who, when and to whom proposed amendments to the Constitution should be submitted and when and under what circumstances they should be considered to be adopted and to go into effect.

The truth is, as held by Justice Brewer in the Kansas case, that the language of the Constitution of Ohio clearly, definitely and distinctly was intended to appropriate the general state election machinery for the adoption or rejection of amendments to the Constitution proposed under its provisions. This is the reasonable and rational construction to be placed upon the language of Article II, Section 1a, that the proposed amendment shall be submitted "at the next succeeding regular or general election." The plain import and intent was that the amendment was to be submitted at the next *succeeding general election* provided by law, existing by law of the state at the time the amendment was written by the convention and adopted by the people.

The constitutional amendment of 1912 was self-executing as to all the material matters relating to the submission, the vote necessary to adopt amendments, and when they should become effective. Section 4785, G. C., must be presumed to have been in contemplation of both the framers of the constitutional amendments and the Legislature. Its provisions as well as those of the Constitution are sufficient to require the elections on amendments to be conducted according to law, and as will be subsequently pointed out, Section 5019 was specially amended to provide for elections on referendum of laws and constitutional amendments, and is adequate for that purpose.

The contention of counsel for plaintiff indicates that the claim is one of irregularity and illegality in the conduct of the election.

In *Link* v. *Karb,* 89 O. S., 21, it is held that elections belong to the political branch of the government; that a petition aver-

ring irregularities and illegalities in an election presents no case authorizing a court of equity to interfere by injunction against the acts resulting from such election; that such petition presents no question of equitable jurisdiction whatever.

An election was had on the amendment under constitutional authority, and the prayer is that it be adjudged that the election was illegal and a nullity because irregularly held.

For this reason plaintiff has no standing in court.

The Attorney-General has argued in effect that if the right of an elector to appeal to the court for the purpose of presenting the questions which are raised by the petition herein is to be recognized; that if we are to recognize his right to represent others similarly situated, and interested in the same way, the ordinary rule of estoppel should be applied to him and those whom he represents.

According to the doctrine enunciated by Mr. Justice Brewer the court may take judicial notice that an election was had, and that those attacking the measure in this action presented at the same election a conflicting proposed amendment for prohibition; it may take notice of the fact that they adopted the same means and machinery to submit their proposed amendment, as did those advocating the amendment here involved; it may take notice of the fact that the so-called "conflicting amendment" was defeated.

If the court be warranted in applying the ordinary rule of estoppel, it would be justified in concluding that plaintiff, and those whom he represents, are estopped from now taking the position that the machinery under which the Home Rule Amendment was adopted, is defective. The doctrine of estoppel applies to those who may raise the constitutionality of a law, but whether it should apply to those raising a question of the invalidity of an amendment to the Constitution, presents a novel question concerning which the court need not express an opinion, except to doubt its application.

ADEQUATE PROVISION IS MADE FOR THE ELECTION MACHINERY. THE INITIATIVE AND REFERENDUM AMENDMENTS TO THE CONSTITUTION ARE SELF-EXECUTING AND HAVE BEEN SUFFICIENTLY SUPPLEMENTED BY LEGISLATIVE ENACTMENT TO CARRY THEM INTO EFFECT.

Sufficient reference has been made to the provisions of the Initiative and Referendum Amendments to the Constitution to show the self-executing character thereof.

Whether or not a constitutional provision is self-executing depends upon whether it is addressed to the courts or to the Legislature. Whether it was intended as a present declaration, complete in itself as a definite enactment, or whether it contemplates legislation to carry it into effect, must be determined from the language used and the character of the provision.

It is said in the case of *Tuttle* v. *National Bank of Republic,* 161 Ill., 502, that:

"Where it is apparent that a particular provision of the organic law shall go into immediate effect without ancillary legislation, and this can be determined by giving full force and effect to all its clauses relating to the same subject and the language is free from ambiguity, then it becomes the imperative duty of judicial tribunals to declare it self-executing; and where the provision is unambiguous and the purpose of the provision would be frustrated unless it be given immediate effect, it will be held self-executing."

That the Initiative and Referendum Amendments were not intended to be and are not dormant and quiescent, awaiting legislative action to call them into life and being, become obvious from consideration of their provisions, and especially from the declaration in Section 1g that:

"That foregoing provisions of this section *shall be self-executing,* except as herein otherwise provided. Laws may be passed to facilitate their operation, but in no way limiting or restricting either such provisions or the powers here reserved."

While such a declaration might not be conclusive upon the courts upon the ultimate question, yet it shows the intent of the framers and is entitled to peculiar weight in its determination. These provisions are a departure, in a marked degree, from the usual and ordinary mandates of the organic law, in the minutia indulged in the very effort to make them complete, specific and self-executing, so as to put it beyond the power of legislative enactment to cripple or defeat the new power, with respect to which a majority of the framers and a large class of the electors were at the time greatly enthusiastic.

The self-executing features become obvious from a consideration of the excerpts previously given in this opinion.

Aside from the conclusive proof of the adoption of existing general legislation concerning regular and general elections manifested by the language of the amendment of 1912 and of 3475, General Code, we have Section 5019 which was subsequently enacted for the express purpose of acting upon the delegation of power to enact laws to facilitate the operation of the I. & R. Amendment.

Section 5019 provides:

"Section 5019. When an amendment to the Constitution is to be submitted to the electors for their approval or rejection, such amendment shall be so submitted on a separate ballot at the top of which shall be printed the words 'Proposed Amendment to the Constitution,' or, if more than one such amendment is submitted at the same election, such heading shall be 'Proposed Amendments to the Constitution.' Each amendment shall be stated thereon in language sufficient to clearly designate it, which statement shall be printed in a space defined by ruled lines with two squares to the left thereof, the upper of which shall contain the word 'Yes,' and the lower word 'No.' There shall be two similar blank squares one to the left of that containing the word 'Yes' and one to the left of that containing the word 'No.' Persons desiring to vote in favor of such amendment shall do so by making a cross mark in the blank square to the left of the word 'Yes,' and those desiring to vote against the same shall do so by making a cross mark in the blank square to the left of the word 'No.' More than one such amendment may be submitted on the same ballot. *The provisions of this title, so far as practicable, shall apply to the marking of ballots and the*

*counting of votes upon any constitutional amendments so sub-*
*mitted.   All such ballots shall be deposited in a separate ballot*
*box."*

Construing the constitutional provisions with the statute, it
is pertinent to inquire what detail of power lies dormant which
it is necessary to call into life by legislative enactment and which
is essential to give the amendments full operation.   The duty of
submitting an amendment to the Constitution for the approval
or rejection of the electors is, by the provisions of Section 1a,
mandatory upon the Secretary of State, whenever the proper
petition therefor is filed with him.   If approved by a majority of
the electors, it shall take effect thirty days after the election
(Section 1b) "and shall be published by the Secretary of State."
This mandate necessarily carries with it, by implication, the
power to require the poll made by the election officers to be re-
turned and declare the result.   Indeed the publication required
is, in effect, such declaration.   But if any power in that regard
be lacking in the constitutional provisions, it is supplied by the
statute (Sec. 5019) to the effect that the provisions of the Title,
Public Elections, being Title XIV of the General Code, shall,
so far as practicable, apply to the "counting of votes upon any
constitutional amendment."   The Chapter XIV of the title in
question relates to returns and abstracts, where may be found
ample provision on the subject entirely applicable to such a
vote.

Our Initiative and Referendum Amendments are in keeping
with the modern ideas and methods of constitution making.   In
marked contrast with the early governmental charters, they are
full of legislation in order that they may be self-executing.

THE CONSTRUCTION AND MEANING OF THE HOME RULE
AMENDMENT.

By its terms it repeals all laws in contravention with its
provisions.

It presents the enactment of any prohibitory law,

"in a subdivision of the state upon the option of the electors
thereof,   *   *   *   which has force within a territory larger

than a municipal corporation or a township outside of a municipal corporation therein.''

It is stated in argument that prior to the election on November 3d last many able attorneys, federal and state judges, held that the language of the amendment could be so construed, if adopted, that it would repeal all laws on the statute books that prohibited the liquor traffic in any degree, such as selling on Sunday, to minors, or to persons in the habit of becoming intoxicated, etc.; that it would also make permanently wet territory of all townships in which no municipal corporation was located, and would prevent the Legislature of the state from enacting any state-wide prohibitory law.

While the court would personally have much respect for the opinions of the eminent gentlemen of which ''judicial notice'' almost might be taken for the purposes of this opinion, still it is believed to be the law as expressed in *Hodges* v. *Dawdy* (Ark.), 149 S. W., 656, that:

''The interpretation given by the advocates of proposed amendments in a political campaign will not be followed by the courts merely because the amendment is thereafter adopted by the voters.''

In the calm judicial consideration of the amendment following the fervid heat of political battle, there is little difficulty in coming to its true import and meaning.

It destroys the county as a unit for prohibitory laws;

It forbids prohibitory laws for an entire county;

It forbids prohibition in the state at large;

It forbids a local option law in a territory larger than a municipal corporation or township;

It does not prevent prohibition for the whole of a township if it has no municipality in it.

If a township has no municipality in it, a prohibitory law may be passed for the whole township. If it has one or more municipalities in it, a prohibitory law may be passed for all territory outside of the municipality or municipalities located therein.

The amendment does not forbid city, residential or municipal prohibition of village or city. Any residential portion of city or village, or the entire or whole of a village or city may have prohibition on local option vote.

The amendment does not, therefore, repeal any law except the Rose county local option law.

It does not repeal Sections 6119-6125, providing for local option in townships.

It does not repeal Section 6127 *et seq.*, providing for local option for municipalities.

It does not repeal local option in residence districts provided for in Sections 6140 *et seq.*

It does not repeal or affect, in the least, the Sunday closing law or any of the regulatory laws providing against the evils resulting from the sale of intoxicating liquors.

There is no reasonable ground for argument or contention to the contrary.

The home rule amendment, without any legislation whatsoever, changes the status of all of the forty-five prohibition counties, forbidding prohibition in them as a county unit. It authorizes the liquor license commission under existing law to appoint license commissioners in all such counties in any village, city, residential district therein, or in any township that may have previously voted prohibition, that is prior to the adoption of the home rule amendment, nor may licenses be granted to persons in territory hereafter voted dry under any of the local option laws not affected thereby.

The construction of the amendment does give it retroactive effect, and forbids the Legislature from passing any prohibitory law covering the county as a unit, or the state at large.

## DOES THE RETROACTIVE EFFECT AND OPERATION MILITATE AGAINST ITS VALIDITY?

Are the retrospective provisions of the state and federal constitutions a limitation upon the right of the people of the states to amend their constitutions?

The constitutional provisions involved in this inquiry are:

*State Constitution, Section 28, Article II*:

"Sec. 28. The General Assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts."

*Federal Constitution, Section 10, Article I*:

"Sec. 10. No state * * * shall * * * pass any * * * *ex post facto* law or law impairing the obligation of contracts."

The words "retrospective" and "retroactive" are synonymous. *Rairden* v. *Holden,* 15 Ohio St., 207.

The inhibition found in Section 28, Article II of the state Constitution, relates to laws and not to constitutional provisions. In adopting it the people placed no limitation upon their power to amend their Constitution. Every constitutional amendment that may be adopted changes to some extent the status and condition of a greater or less number of citizens. The logic of the plaintiff's contention is that so long as he continues in the piano business or continues to own stock in a building and loan association, the people of Ohio are precluded from making any change in their organic law and are forever bound to the Procrustean bed constructed by the framers of the Constitution of 1851. To state the proposition is to refute it.

The expression "*ex post facto laws,*" used in the federal Constitution, relates to penal and criminal proceedings which impose punishments and forfeitures, and not to civil proceedings which affect private rights retrospectively. *In re Sawyer,* 124 U. S., 219.

The tempermental change in the attribute of thrift which will overtake the population of Bellefontaine upon the introduction of saloons, whereby their ability to buy or pay for pianos will be impaired and the depreciation which will thereby result in the values of real estate, thus affecting his investment in building and loan association stocks, will not operate, within the meaning of the federal Constitution, to impair the obligation of any of his contracts.

A lawful tax on a new subject or an increased tax on an old one, does not interfere with a contract or impair its obligation within the meaning of the Constitution, even though such taxation may increase the debt of one person and lessen the security of another.

It was held in the case of *Hay* v. *Hill*, 65 Cal., 383, as follows:

"'A mortgage was executed in 1879. It contained no special covenant as to the payment of taxes. Subsequently, by a constitutional provision, the mortgagee was made primarily liable for taxes upon the mortgage interest. Where it was contended that as the note and mortgage were made before the constitutional provision went into effect, the provision could not be applied to previous taxes without infringing the Constitution of the United States, the court held that the obligation was not impaired."

### DOES THE AMENDMENT DESTROY THE REPUBLICAN FORM OF GOVERNMENT?

It is contended that it prevents the Legislature of the state from enacting a law prohibiting the manufacture and sale of intoxicating liquors throughout the state, and that by so doing violates the welfare clause of the federal Constitution, together with Article XIV, Section 1.

Article IV, Section 4, provides:

"The United States shall guarantee to every state in the Union a republican form of government," etc.

A republican form of government means, of course, a government having the three distinct functions of government—legislative, executive and judicial.

The contention is that the so-called Home Rule Amendment is an abatement of the legislative department of government on the subject of prohibiting the manufacture and sale of intoxicating liquor throughout the state. In other words, that the amendment is a prohibition of prohibition by legislative enactment, and a surrender of the legislative department of government on that subject, hence in violation of the federal Constitution.

It is argued, and authorities are cited, that the supervision of the public health, and the public morals is a governmental power (*Stone* v. *Miss.*, 101 U. S., 814) : that "no Legislature can bargain away the public health or the public morals; *that the people themselves* can not do it; that government is organized with a view to their preservation and can not divest itself of the power to provide for them." *Id.*

A republican form of government within the meaning of Article IV, Section 4, federal Constitution, is taken to mean and comprehend the kind of state governments existing at the time of the adoption of that Constitution. The Constitution of the federal government did not contemplate a change in existing forms of state governments, but such existing governments were accepted precisely as they were. "Thus we have," Chief Justice Waite, in *Minor* v. *Happersett*, 21 Wall., 175, says, "unmistakable evidence of what was republican in form within the meaning of that term as employed in the Constitution." But he says: "No particular government is designated as republican, neither is the exact form to be guaranteed, in any manner, especially designated."

Judge McClain in his Constitutional Law holds that "it may well be contended that a republican form of government contemplates one by representative bodies, and the distribution of the powers of government among distinct and independent departments."

If the Home Rule Amendment was a proposed law within the Initiative and Referendum Amendment to the Constitution there might be some basis for the contention. While some contended in the infant days of the I. & R. that "a legislative body, so shorn of its customary and constitutional functions, can not be longer regarded as the representatives of the people; that the legislative body can not be halved, quartered nor in any way subdivided" (56 Cent. Law. J., 247), still it must be kept in mind that there is a marked distinction between the act of the people in reversing the power to propose amendments to the Constitution, to adopt or reject the same, instead of allowing the same to be proposed by the Legislature as formerly, and the reservation of the power to propose and adopt laws.

In *Kadderly* v. *Portland,* 44 Ore., 118, 144, the Supreme Court of that state held that the initiative and referendum for laws did not destroy nor materially curtail the authority of the legislative body.

When the Initiative and Referendum Amendment to the Constitution was brought before the Supreme Court of the United States, for the purpose of having it declared invalid as in violation of the guaranty of a republican form of government by Article IV, Section 4 of the federal Constitution, that court expressed its judgment that there was no judicial question involved that the controversy presented a matter purely political, committed to the legislative branch of the government of the United States; it fixed

"the inconceivable expansion of the judicial power and the ruinous destruction of legislative authority in matters purely political which would necessarily be occasioned by giving sanction to the doctrine which underlies and would be necessarily involved in sustaining the proposition,"

such as is made in the case at bar concerning the violation of the constitutional guaranty of a republication form of government.

It is held in *Pacific States Telephone and Telegraph Co.* v. *Oregon,* 223 U. S., 118, that:

"The enforcement of the provision in Section 3, Article IV of the Constitution that the United States shall guarantee to every state a republican form of government, is of a political character and exclusively committed to Congress, and as such is beyond the jurisdiction of the courts.

"The provisions of Section 4 of Article IV of the Constitution do not authorize the judiciary to substitute its judgment as to a matter purely political for the judgment of Congress on a subject committed to Congress.

"Under Section 4, Article IV of the Constitution it rests with Congress to decide what government is the established one in a state, and its decision is binding on every other department of the government, and can not be questioned by the judiciary. *Luther* v. *Borden,* 7 How., 1.

"A statute otherwise constitutional can not be attacked in the courts on the ground that it was adopted in pursuance of provisions in the constitutions of the state which render the form of government of the state unrepublican in form within the meaning of Section 4 of Article IV of the Constitution. The courts

have no jurisdiction of the question; it is for Congress to determine.

"Whether the adoption of provisions for the initiative and referendum in the Constitution of a state, such as those adopted in Oregon in 1902, so alter the form of government of the state as to make it no longer republican within the meaning of Section 4 of Article IV of the Constitution, is a purely political question over which the court has no jurisdiction."

The statement made in the opinion of the Supreme Court of the United States in *Stone* v. *Mississippi*, 101 U. S., 814, cited by counsel, to the effect that the people themselves can not bargain away the public health, presents an interesting topic though not difficult of solution.

The question whether the legislative body may take action "bargaining away the public health," is radically different from that whether the people themselves, the original source of all power, may do so.

The parallelism may be drawn from the fact that the Continentalists and the British nation may make their Hague Compacts, and their bargainings of neutrality, but when the gates of Hell are opened· for war, no compact or bargain was sufficiently binding in the sight of God or Nation, to prevent the sweeping away or breaking of all compacts, agreements or rules of God or of humanity.

*A fortiori,* if the people themselves in whom resides the source of all power, decide to reverse the principles of the police power which have heretofore established by legislatures and the judiciary, the power to declare which having always heretofore been exercised by the legislative branch of government, as part of the inherent power of government, there is no power to prevent such action by the people themselves in the exercise of their power to make Constitutions, or laws, under the Initiative and Referendum, except by the adoption of another and radically different or contrary amendment or law, by legally authorized expression of the people at an election duly authorized and held.

The judiciary as an agency of government certainly can not be expected to nullify and set aside the will of the people on technical grounds by the exercise of a power higher than the source of its own. And there is nothing in the compact made

between the states as evidenced by the federal Constitution, that authorizes or empowers a state or federal court, or the federal Congress even, to override or nullify the voice of the people of a state, so long as they do not entirely destroy or impair the republican form of government guaranteed by the federal Constitution. And this a state does not do when the people thereof in the proper and legal exercise of the function of amending their Constitution adopt an amendment incorporating a rule of conduct into such Constitution, which does not amount to a total abrogation or destruction of a republican form of government.

This, it seems to the court, presents the precise situation, concerning the adoption of the Home Rule Amendment as part of the Constitution.

The court has disposed of all the questions made in this case, and the final conclusion must be that the judiciary is utterly powerless to furnish the relief prayed for by the petition.

Therefore the judgment is that the demurrer to the petition is sustained and the action is, therefore, ordered dismissed.